R. S. HINTON, ON BEHALF OF HIMSELF AND OTHER TAXPAYERS OF .THE STATE OF NORTH CAROLINA, v. B. R. LACY, AS STATE TREASURER, AND W. N. EVERETT, W. A. GRAHAM, DENNIS G. BRUMMITT, FRANK D. GRIST AND B. R. LACY, AS MEMBERS OF THE BOARD OF ADVISORS, CREATED BY CHAPTER 155, PUBLIC LAWS OF 1925, AND JOHN H. MANNING, AS COMMISSIONER OF THE VETERANS LOAN FUND UNDER SAID CHAPTER.

(Filed 6 April, 1927.)

**1. Constitutional Law—Statutes—Courts.**

The courts will not declare a statute unconstitutional where its validity may be sustained by a reasonable construction, or its invalidity by such interpretation thereby unmistakably appears.

**2. Constitutional Law—Taxation—Bonds — War — Faith and Credit— Loans to Veterans—Public Purpose.**

A statute for the purpose of issuing bonds, passed by the Legislature in accordance with the constitutional provision as to the "aye" and "no" vote, and its passage upon the separate days by each branch of legislation, and which has been approved by the vote of the people of the State at an election duly had for the purpose, Const., Art. V, sec. 4, providing for an issuance and sale of State bonds for the purpose of lending the proceeds

on mortgage to a certain amount of the value of the land to the veterans of the World War to help them in providing homes for themselves, is the pledging of the credit of the State for a public purpose, and is a valid exercise of statutory authority.  Const., Art. VII, sec. 7.

**3. Same—Class Legislation—Uniformity of Taxation.**

It is not unconstitutional as class legislation for a statute providing for the sale of State bonds for the purpose of aiding veterans of the World War in acquiring homes by loaning them money under mortgage, for the act to exclude those who had not engaged in active military service or who had been dishonorably discharged, or who had secured positions under the Government during the war that had not exposed or tended to expose them to danger in the fighting territory.  Const. of N. C., Art. I, sec. 26; Art. XII, sec. 1.

**4. Same—Curative Statutes—"Aye" and "No" Vote—Separate Days.**

Where a statute, pledging the faith and credit of the State in issuing State bonds, has not been passed in accordance with the provisions of our State Constitution, Art. II, sec. 14, and are therefore invalid, its invalidity may be cured by a later statute passed as the Constitution requires, referring to the former statute, and supplying the omissions, and the bonds thereunder issued after the question has been submitted to and approved by the voters of the State, as the statute required, are valid.

**5. Same—Government—Federal Government.**

Under our system of government, a declaration of war by Congress and the drafting of soldiers, is an act on the part of each State in the Union, and is for the interest of all, and does not affect the validity of a State bond issue providing money to aid the citizens of the State who had performed active military service in the war so declared, which is otherwise valid under the Constitution of the State enacting the statute.

APPEAL by plaintiff from *Devin, J.,* at January Term, 1927, of WAKE.  Affirmed.

This action was brought to restrain the defendants from acting under and carrying out the provisions of chapter 155, Public Laws of 1925, known as the World War Veterans Loan Act.  The act provides for the issuance of $2,000,000 in bonds by the State of North Carolina and the use of this sum in making loans to veterans of the World War, the loans not to be in excess of $3,000 to any one person, and not to exceed seventy-five per cent of the appraised value of the real estate offered as security.  The proposition was submitted under the terms of the act to the electors of the State at the general election held on 2 November, 1926, and was carried for the issuance of the said bonds by a majority of 39,867 of the votes cast on the proposal.

The plaintiff brings this action to restrain the issuance of the bonds. He alleges that the act authorizing the bonds is unconstitutional and void for that taxes and public revenues can be levied only for public purposes; for that it violates Article I, sec. 17, of the Constitution,

32—193

which provides that no person shall be deprived of his property except by the law of the land; for that it is class legislation and confers privileges and emoluments upon a set of men not in consideration of public services in violation of Article I, sec. 7 of the Constitution, and for that it violates the spirit of Article I, sec. 26, and Article XII, sec. 1, of the Constitution; and for the reason that the act does not specifically declare that the full faith, credit and taxing power of the State are pledged to the payment of the principal and interest of the bonds, and the Board of Advisers is without power or authority to resolve that each bond shall recite upon its face that the full faith, credit and taxing power of the State are pledged to the payment of the principal and interest thereof. The other necessary facts and contentions will be stated in the opinion.

*Bunn & Arendell for plaintiffs.*
*Attorney-General Brummitt, Assistant Attorney-General Nash and John H. Manning for defendants.*

CLARKSON, J. The Legislature of 1923 passed an act known as the "World War Veterans' Loan Act," Public Laws 1923, ch. 190. The purpose of the act was to make loans to provide urban and rural homes upon favorable terms for veterans who served with the military or naval forces of the United States in the recent war with Germany and the other Central Powers. To carry out the provisions of the act the question of contracting a $2,000,000 bonded indebtedness of the State of North Carolina was submitted to a vote of the people of the State at the general election in 1924. The vote for the bonded indebtedness was 143,015, against 62,261—a majority of 80,754 of the votes cast. The question arose as to whether the act as submitted required a majority of the qualified electors or a majority of the votes cast on the proposal. This Court, in *Patterson v. Everett,* 189 N. C., p. 828, under the interpretation given to the act, decided that the authority to issue the bonds had to be approved by a majority of the qualified electors of the State and not of the votes cast. It was conceded that this was not done, and the bonds therefore, if issued, would not be valid and binding obligations of the State. The decision states that "The parties having requested a decision in this case during the present session of the Legislature, to the end that further action may be had upon the subject, if found necessary." The decision was rendered 25 February, 1925.

In consequence the Legislature of 1925, then in session, again submitted the proposition to the people of the State—qualified electors—at the November, 1926, election. The proposal submitted required a majority of the *votes cast,* the adoption was by a majority of 39,867.

The ideals of the two acts are practically the same. We have under consideration in this case, therefore, a proposition which has received the calm, deliberate approval of two General Assemblies, was passed by both in accordance with the constitutional requirements, and has been calmly and deliberately considered by the people of this commonwealth in two general elections, and in both of these elections the people have sanctioned this measure by an overwhelming majority of those voting on the proposal submitted.

Sec. 2 of the act (Public Laws 1925, ch. 155), says: "The purpose of this act is, in recognition of military service, for the encouragement of patriotism, and to promote the ownership of homes, to provide a means by which soldiers, sailors, marines and others who served with the armed forces of the United States in the recent World War against the central powers may acquire urban homes or farms upon favorable terms."

At a Congress of the representatives of the Freemen of the State of North Carolina, assembled at Halifax on 17 December, A.D. 1776, a declaration of rights was read three times, and ratified in open Congress, and on 18 December, A.D. 1776, the first State Constitution was ratified in the same manner, and "the declaration of rights is hereby declared to be a part of the Constitution of this State and ought never to be violated on any pretense whatever." (Sec. 44.) This State, on 21 November, 1789, ratified the Constitution of the United States. At New Bern, November Term, 1787, in *Bayard v. Singleton*, 1 N. C., 42, an act of the General Assembly of 1785 was declared unconstitutional and void—"stand as abrogated and without any effect." This power has since consistently been recognized in this State.

Speaking to the subject, this Court, in *S. v. Knight*, 169 N. C., at p. 352, said: "Between these cases that are cited, running from the first volume of our Reports to the 160th, covering a period of one hundred and twenty-five years, there could be cited fifty or more cases in which acts of the General Assembly have been declared unconstitutional, and we can find no judicial opinion to the contrary."

In *Sutton v. Phillips*, 116 N. C., at p. 504, speaking to the question, this Court said: "While the courts have the power, and it is their duty, in proper cases to declare an act of the Legislature unconstitutional it is a well recognized principle that the courts will not declare that this coördinate branch of the government has exceeded the powers vested in it unless it is plainly and clearly the case. *If there is any reasonable doubt it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.* (Italics ours) . . . (p. 505). It cannot be said that this act is plainly and clearly unconstitutional. The doubt, if any, must be resolved in favor of the General Assembly."

*S. v. Baskerville,* 141 N. C., 818; *In re Watson,* 157 N. C., at 349; *S. v. Knight,* 169 N. C., at 352; *Faison v. Comrs.,* 171 N. C., 415; *S. v. Perley,* 173 N. C., 790; *R. R. v. Cherokee County,* 177 N. C., 88; *Coble v. Comrs.,* 184 N. C., 342; *S. v. Kelly,* 186 N. C., 377; *R. R. v. Forbes,* 188 N. C., 155.

Every presumption is in favor of the constitutionality of an act of the Legislature, and without the clearest showing to the contrary it should be sustained. It is to be presumed that the law-making body were mindful of their oaths and acted with integrity and honest purpose to keep within the constitutional limitations and restrictions. The breach of the Constitution must be so manifest as to leave no room for reasonable doubt.

Mr. Banks Arendell, an ex-service World War veteran (lieutenant who went over seas), representing plaintiff, in an able argument and brief, contends:

(1) "The purpose of the act is not a public purpose, and violates a fundamental principle, and also Article I, sec. 17, of the Constitution. The act violates Art. I, sec. 7, of the Constitution. Privileges granted are not in consideration of public service."

Const., Art. I, sec. 17, is as follows: "No person ought to be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, but by the law of the land." Compare Const. of U. S., Art. XIV, sec. 1—due process clause.

The principle laid down in *Comrs. v. State Treasurer,* 174 N. C., at p. 146, is cited: "It is a fundamental principle in the law of taxation that taxes may only be levied for public purposes and for the benefit of the public on whom they are imposed, and to lay these burdens upon one district for benefits appertaining solely to another is in clear violation of established principles of right and contrary to the express provisions of our Constitution, Art. I, sec. 17, which forbids that any person shall be disseized of his freehold, liberties and privileges or in any manner deprived of his life, liberty or property but by the law of the land." This principle has been reiterated in *Ellis v. Green,* 191 N. C., at p. 765.

The question is also presented by plaintiff: Is payment to a Federal soldier a public purpose of the State? Is payment of a reward or gratuity to any soldier, Federal or State, a public purpose of the State if made after the war is over, and not under any promise, express or implied, which would have encouraged enlistment?

On the other hand, it is admitted by defendants that "Taxes and public revenues can be levied only for public purposes. That the purpose of this act is public rather than private. It does not grant privi-

leges and emoluments but in consideration of public services. The de-
fendants contend that this measure is in line with the well settled policy
of the State; that it is for a public purpose; is in consideration of
public service and not in any sense class legislation. The act does not
propose any gift to those for whose benefit it was passed. It simply
proposes to aid them in the acquirement of homes. The money to be
loaned is well protected in that the amount which can be loaned to any
one person is limited to $3,000 and cannot exceed seventy-five per cent
of the appraised value of the real estate offered as security. For the
promotion of agriculture, the Federal Government has established Farm
Loan Banks, and this act is modeled after the act of Congress on that
subject. This State now does many things for the promotion of agri-
culture and its industries. It has never been suggested or held that such
was class legislation. The State has granted pensions to Confederate
soldiers, involving the payment of large sums of money in the aggre-
gate, and even the present General Assembly made a substantial increase
in appropriations for this purpose. The payment of pensions to Con-
federate soldiers has been approved by popular sentiment since the first
legislative enactment, and the authority so to do has never been denied
by this Court. At this time pensions to Confederate soldiers are larger
per capita and in the aggregate than ever before in the history of the
State, and such payments are sanctioned by the almost unanimous voice
of the people." We agree with the contention of the defendants, and
are of the opinion that the purpose of the act is public.

This proposal has been passed upon twice by the Legislature and
twice a majority of the qualified votes cast at general elections have
approved the purpose, the ballot voted being "For World War Veterans'
Loan Bonds."

The first section of "A declaration of rights" of the people of the
State, ratified 17 December, 1776, says: "That all political power is
vested in and derived from the people only."

The second section of Article I of the present Constitution (1868)
says: "That all political power is vested in, and derived from, the peo-
ple; all government of right originates from the people, is founded
upon their will only, and is instituted solely for the good of the whole."

The will of the people has been twice expressed by solemn ballot.
The present act, we think, is not only for a public purpose, but is for
the good of the whole, and comes clearly within the limitations and
restrictions of the Constitution of this State.

Even in Article V, part sec. 4, where there is restriction upon the
increase of the public debt, it is set forth: "And the General Assembly
shall have no power to give or lend the credit of the State in aid of any
person, association or corporation, except to aid in completion of such

railroad as may be unfinished at the time of the adoption of this Constitution, or in which the State has a direct pecuniary interest, *unless the subject be submitted to a direct vote of the people of the State, and be approved by a majority of those who shall vote thereon."* *Galloway v. R. R.,* 63 N. C., p. 147.

In *Hudson v. Greensboro,* 185 N. C., p. 502, "the statutes authorizing a city to issue its bonds and lend the proceeds of their sale to a railroad company to build a depot within its limits, when the question has been submitted to and approved by its voters, does not contravene the State Constitution, and is valid." *Clark, J.,* "We find that the undertaking is for a public purpose."

In *Ketchie v. Hedrick,* 186 N. C., p. 392, it is held, in substance, that under Article VII, sec. 7 of our State Constitution, restricting the power of the Legislature from allowing counties, cities, towns, or other municipal corporations to contract a debt, pledge its faith or loan its credit, or to levy or collect any tax except for the necessary expense thereof, does not authorize an appropriation of a certain per cent of taxes levied upon their taxpayers for the use or disposition of a chamber of commerce of a city, without the approval of the qualified voters therein ascertained by an election duly held for that purpose.

From the reference it appears that our Constitution is liberal and the decisions of this Court go far in upholding questions where the matter has been submitted to the vote of the qualified electors—the people—carrying out the spirit, "and keep in mind that this is a government of the people, by the people, for the people, founded upon the will of the people and in which the will of the people legally expressed must control." *Quinn v. Lattimore,* 120 N. C., at p. 428.

Since the World War legislative enactments for bonuses, loans and welfare bonds for the World War veterans have been the subject of judicial decisions in many of the states of the Union.

*Wisconsin:* Known as "Soldiers' Bonus Law" (cash) estimated $15,000,000, voted on by the electors of the State in the affirmative at election held on 2 September, 1919. The purpose of the act was held to be public and not private, therefore constitutional. *S. v. Johnson* (170 Wis., 218), 175 N. W. Rep., p. 589. "Educational Bonus Act" is a public purpose and constitutional. *S. v. Johnson* (170 Wis., 251), 176 N. W. Rep., p. 224.

*State of Washington:* "The Veterans' Equalized Compensation Act" of $11,000,000 was approved by the electors of the State at an election held 2 November, 1920. The act provided for a bonus. The purpose of the act was held to be public and not private, therefore constitutional. *S. v. Clausen* (113 Wash., 570), 194 Pac. Rep., p. 793. See, also, *S. v. Clausen,* 201 Pac. Rep., p. 30.

*Minnesota:* Known as "Soldiers' Bonus Law" of $20,000,000, passed by Legislature without a vote of the people. The purpose of the act was held to be public and not private, therefore constitutional. *Gustafson v. Rhinow* (114 Minn., 415), 175 N. W. Rep., p. 903.

*Missouri:* Known as "State of Missouri World War Soldier Bonus Bonds," $15,000,000, voted on by people in the affirmative. The purpose of the act was held to be public and not private, therefore constitutional. *Fahey v. Hackmann* (291 Missouri, 351), 237 S. W., p. 752.

*Illinois:* Known as "Soldiers' Compensation Act," $55,000,000, passed by both branches of the Legislature without a dissenting vote. At the election 1,220,815 voted for it and 502,372 against it. The purpose of the act was held to be public and not private, therefore constitutional. *Hagler v. Small* (307 Ill., 460), 138 N. E. Rep., p. 849.

*Iowa:* Soldiers' Bonus Act, $22,000,000, submitted to a vote of the people and duly ratified at general election held 7 November, 1922. The purpose of the act was held to be public, and therefore constitutional. *Grout v. Kendall* (195 Iowa, 467), 192 N. W., p. 529.

*Kansas:* Known as "Kansas Soldiers' and Sailors' Act," $25,000,000, submitted to people by Legislature of 1921. Adopted by people by constitutional majority. Held to be for public purpose, and therefore constitutional. *S. v. Davis* (113 Kan., 4), 213 Pac. Rep., 171.

*California:* "Veterans' Welfare Bond Act," $10,000,000, 1921, submitted to voters of State and adopted. To be used "to acquire farms or homes." Held valid expenditure, public money for public purpose. *Veterans' Welfare Board v. Jordan,* 189 Cal., p. 124.

Most of the states gave bonuses to those who served longer than two months and honorably discharged, and who were in the service between 6 April, 1917, and 11 November, 1918, when war was declared, and Armistice Day.

*New York:* Bonus Act of 1920, providing for issue of $45,000,000, bonus for World War Veterans of New York, vote for 1,454,940, against 673,292. The majority of the Court held it invalid under Constitution of New York—*Cardoza* and *Pound, JJ.,* dissenting. *People v. Westchester* (231 N. Y., 465), 132 N. E. Rep., p. 241. Following the decision, the Legislature of New York submitted a constitutional amendment to the people of the State, on 28 February, 1923, authorizing issuance not to exceed $45,000,000 in bonds with which to pay a cash bonus to World War Veterans; this amendment was adopted at general election 6 November, 1923, by a substantial majority.

*Maryland:* In *Brawner v. Curran* (141 Md., 586), 119 Atl. Rep., p. 250, $9,000,000. Soldiers' Bonus Act held unconstitutional, but the Court said, at p. 255: "We are keenly conscious of the sacrifices which the soldiers, sailors, and nurses from this State made in the Great War,

of the hardships they endured, of the high service they rendered, of the value of that service to the State and its people, and of their just claim to the grateful consideration of this State. It is unfortunate that this legislation through which the State attempted in some measure to recognize that claim must fall."

*Montana:* Soldiers' Compensation Act not public purpose. *S. v. Dixon* (66 Mont., 76), 213 Pac., 227.

(2) It is contended that it violates Article I, sec. 7, of the Constitution, which is as follows: "No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services."

The cases cited by plaintiff—like *Simonton v. Lanier,* 71 N. C., p. 503—are not applicable. The *Simonton case* was a private purpose, special privilege. "The charter of the Bank of Statesville was given the special privilege to lend money at a higher rate than the general State law. Referring to Article I, secs. 7 and 31, *supra, Bynum, J.,* said: 'The wisdom and foresight of our ancestors is nowhere more clearly shown than in providing these fundamental safeguards against partial and class legislation, the insidious and ever-working foes of free and equal government.' " This principal has been approved in *Power Co. v. Elizabeth City,* 188 N. C., at p. 288, and at this term in *S. v. Fowler, ante,* p. 290.

We think the spirit of this section, as well as the language "consideration of public services," must be construed in the light of the past. The philosophy of the life and conduct of the people of this State and its history has ever been generous and grateful to its heroic defenders in time of war, from its foundation to the present hour.

*For example.* Captain Johnston Blakely, a North Carolinian, commander of United States sloop of war, *Wasp,* which defeated the British sloops of war, *Reindeer* and *Avon,* in 1814 (in the War of 1812), and soon thereafter disappeared with all on board—one of the mysteries of the sea. He left an infant daughter, Udney Maria, and she was educated at the expense of the State in the best schools; an appropriation of $600 a year was made for her education and support, totalling $7,600. The Legislature authorized a superb sword, appropriately adorned, to be presented to Captain Blakely, but on his death the Legislature changed the gift and presented a set of tea plates, costing $500, to his daughter. The General Assembly of 1817 voted a sword and $250 annually for seven years to James Forsythe, eight-year-old son of Lieutenant-Colonel Benjamin Forsythe, of Stokes County, who served with distinction in the United States Army during the War of 1812, and was killed near Odelltown, Canada, in 1814. Forsyth County is named in his honor.

All through the history of the State are appropriations for pensions, etc., for the soldiers and sailors engaged in the different wars—monuments and other patriotic remembrances too numerous to mention. The legality of the appropriations have never been questioned.

A promise can be express or implied from surrounding circumstances. The service was *public,* the *consideration* is implied, as pensions and the like to soldiers and sailors have always been granted in this commonwealth since its origin, and the construction is based on the previous setting. We think this is the just and righteous construction of the language of the Constitution.

Mr. Brummitt, the able and distinguished Attorney-General, in a logical and eloquent argument before this Court, in part, said: "Since the dawn of civilization the nations of the earth have always recognized an obligation to those of its citizens who bore arms in their defense. This obligation has been fulfilled in many ways. Appropriate recognition of it has always served to encourage patriotism and the promotion of public welfare." He stated on the argument that, in his opinion, from a thorough examination of the Constitution and authorities, there was no question as to the legality of the act under consideration.

(3) It is contended that the classification is improper and unreasonable. The disabled are not compensated or rewarded. Religious discrimination voids the act under (a) Const., Art. I, sec. 26: "All men have a natural and inalienable right to worship Almighty God according to the dictates of their own conscience, and no human authority should, in any case whatever, control or interfere with the rights of conscience." (b) Const., Art. XII, sec. 1: "All able-bodied male citizens of the State of North Carolina, between the ages of twenty-one and forty years, who are citizens of the United States, shall be liable to duty in the militia: *Provided,* that all persons who may be averse to bearing arms, from religious scruples, shall be exempt therefrom."

Sections 3 and 4 of the act (Public Laws 1925, ch. 155) are as follows:

"Sec. 3. Every person who was enlisted, inducted, warranted or commissioned, and who served honorably in active duty in the military or naval service of the United States at any time between the sixth day of April, one thousand nine hundred and seventeen, and the eleventh day of November, one thousand nine hundred and eighteen, and who, at the time of entering such service, was a resident of the State of North Carolina, and who is honorably separated or discharged from such service, or who is still in active service, or has been retired, or who has been furloughed to a reserve, and who was in such service for a period of longer than sixty days, shall be entitled to borrow money from the fund provided by this act upon filing application and otherwise complying with

the terms hereof so long as and to the extent that the funds herein provided for are available for that purpose.

"Sec. 4. The benefits of this act shall not be extended to the following classes of persons:

"(a) Those who were dishonorably discharged or discharged without honor; or

"(b) Those who, being in the military or naval service, refused on conscientious, political, or other grounds to subject themselves to discipline or to render unqualified service; or

"(c) Those who, though in the service, did civilian work at civilian pay; or

"(d) Those whose military service was confined to taking training in any students army or navy training corps."

It will be noted, under section 3, *supra,* that there is no discrimination between the able and disabled in regard to obtaining the benefit of the loan fund—they have equal rights under the act. It may be that the disabled should have extra compensation or reward, but this is not for us to determine. As to religious discrimination making the act void, we cannot so interpret it. The statute follows the Constitution and deprives certain classes of the benefits of the act. As to those who were "bomb-proof" and took no chances, they cannot complain. In each class all are treated alike. It is well settled that such legislation is not improper or unreasonable.

It is contended that the bonds violate the legislative act in pledging the faith, credit and taxing power of the State, Const., Art. II, sec. 14: "No law shall be passed to raise money on the credit of the State, or to pledge the faith of the State, directly or indirectly, for the payment of any debt, or to impose any tax upon the people of the State, or allow the counties, cities or towns to do so, unless the bill for the purpose shall have been read three several times in each house of the General Assembly and passed three several readings, which readings shall have been on three different days, and agreed to by each house respectively, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the journal." This contention has been eliminated. Since this case has been argued, the Legislature, H. B. 954, S. B. 1169, ratified 4 March, 1927, has passed an act in compliance with the provisions of the above article of the Constitution, of which we take judicial notice. Sections 1 and 2 are as follows:

"Sec. 1. This act shall be known and may be cited as the 'World War Veterans Supplemental Act.'

"Sec. 2. The full faith, credit and taxing power of the State are hereby pledged for the payment of the principal and interest of the two million dollars ($2,000,000) State of North Carolina World War Vet-

erans Loan Bonds, authorized by chapter one fifty-five, Public Laws of nineteen hundred and twenty-five, and for the payment of the principal and interest of any notes issued in accordance with this act in anticipation of the sale of said bonds or any of them. When the Board of Advisers shall direct the State Treasurer to issue any of said bonds he shall sell the same at one time or from time to time at the best price obtainable, but in no case for less than par and accrued interest, and when the conditions are equal, he shall give the preference of purchase to the citizens of North Carolina. The manner in which said bonds shall be offered for sale shall be determined by the Governor and Council of State, either by publishing notices in certain newspapers and financial journals, or by mailing notices, or by inviting bids by correspondence or otherwise. All expenses necessarily incurred in the preparation and sale of the bonds shall be paid from the proceeds of such sale."

(4) It is contended that the act is paternalistic and extravagant. Plaintiff's attorney, a courageous ex-service soldier, who was over seas, says: "Finally, in both theory and practice, the purpose of this act is too paternalistic. It tends to kill the incentive on the part of its beneficiaries to work for what they get. An able-bodied ex-soldier, sailor or marine, ought not to need the sort of wing-sheltering that this proposed bond issue contemplates. If this bond issue is ratified by this Court, especially during the wild orgy of bond issues which we have gone through during the last few years, who knows but that some politician bidding for the ex-soldier vote, will propose another issue to equip these homes contemplated under this present bond issue with victrolas, radios and frigidaires, and possibly even new automobiles for the ex-service men? In fact, it might fall out that those of us of less iridescent dreams, might, at some future time, rise up and shout in unison, 'Quos Vadimus.'" The wisdom of the legislation or the soundness of the economic policy involved is not within our province.

In the cases cited over the nation, the enormous bond issues approved have been almost all for *bonuses*. A case somewhat similar to the one at bar, heretofore referred to, was from California—"to acquire farms and homes." It is held in South Dakota that a statute authorizing loans to war veterans to enable them to purchase land is not a personal gratuity or donation, forbidden by the Constitution. *Wheelon v. South Dakota Land Settlement Board,* 43 S. D., 551, 181 N. W., 359; 14 A. L. R., 1145.

The present act is not a gift or gratuity, but a loan to worthy veterans—an easy method, financed by the State, to acquire homes. The selective draft took the young men first—just entering on their life-work, at the threshold of manhood, crippled their opportunities, gave

small remuneration and made it practically impossible for them to acquire homes for themselves or families. The majority called to the colors were in service several years. Those that were not called, although "keeping the home fires burning," had chances for accumulation of wealth as never in the history of the country. Those that were called were the protectors of the life and property of the people of the Union of indivisible states. The contract for service under the selective draft was not mutual, but one-sided, fixed by the Government, and those called were compelled to respond and accept what was allowed them. Heretofore the wars that have been fought were mostly on our own soil and continent and close to homes, but in the history of the world no men have ever gone with more willingness and patriotic resolve (though some were drafted), thousands of miles from home and native land, across the Atlantic to another continent, to fight to destroy autocracy and make democracy. It was the world's crucial struggle. It is held by the United States Supreme Court, and the almost unanimous holding in the states of the Union, that there is an obligation, call it what you may, an implied contract, a legal or moral obligation, to recompense, reward and pension war veterans. In the *World War* this should extend to regulars, volunteers and those drafted from the respective states. In the present case it is merely a loan, requiring security, and must be paid back.

In *United States v. Hall,* 98 U. S., at p. 346, it is said: "Power to grant pensions is not controverted, nor can it well be, as it was exercised by the states and by the Continental Congress during the War of the Revolution; and the exercise of the power is coeval with the organization of the government under the present Constitution, and has been continued without interruption or question to the present time. . . . (p. 350). Such laws had their origin in the patriotic service, great hardship, severe suffering, and physical disabilities contracted while in the public service by the officers, soldiers, and seaman who spent their property, lost their health, and gave their time for their country in the great struggle for liberty and independence, without adequate or substantial compensation. . . . (p. 351). Bounties may be offered to promote enlistments, and pensions to the wounded and disabled may be promised as like inducements. Past services may also be compensated, and pensions may also be granted to those who were wounded, disabled, or otherwise rendered invalids while in the public service, even in cases where no prior promise was made or antecedent inducement held out."

Cooley, Taxation, Vol. I (4 ed.), at p. 459-460, says: "In most of the states, however, especially in the later decisions involving bounties to veterans of the World War, such bounties or bonuses have been upheld as being imposed for a public purpose, especially ·where the bonus is

merely an educational bonus; and this includes bounties to Confederate veterans after the Civil War, to veterans of the 1916 Mexican trouble, and to veterans of the late World War. So an appropriation for the support of ex-army nurses and certain female relatives of veterans of the Civil War, in a Woman's Relief Corps Home, is held to be for a public purpose. The basis for upholding such legislation in favor of veterans has been variously ascribed to gratitude, benefits to the people of the State by protecting life and property, and the existence of a moral obligation to compensate for the public services rendered; and it makes no difference that the services were rendered primarily in behalf of the Federal and not of the State government."

What is a public purpose or general welfare or for "good of the whole" has given rise to no little judicial interpretation and consideration. Some courts have taken a liberal view, and to a great extent left it to the determination of the Legislature and referendum of popular vote, but we should ever be mindful that the Constitution to a great extent is the rudder to keep the ship of State from off the rocks and reefs. The question is Federal as well as state—the taking of money by taxation for private instead of public purposes is a violation of both the State and Federal Constitution (14th Amendment U. S. Const.).

The Supreme Court of the United States, in *Green v. Frazier,* 253 U. S., p. 233, sustained the Home Building Act of North Dakota, and held this legislation not to amount to a taking of property without due process of law.

Our own Court, in *R. R. v. Forbes, supra,* 188 N. C., at p. 155, said: "The Constitution, Art. II, sec. 7, directs that beneficent provision be made for the poor, the unfortunate, and the orphan, and the Court has said that the law providing pensions for persons disabled in war, and their widows, was enacted in the discharge of a legal as well as a moral obligation. *Board of Education v. Comrs.,* 113 N. C., 379, 383."

Finally, the plaintiff puts the query: "Is payment to a Federal soldier a public purpose of the State?" We are now considering those Federal soldiers, sailors and marines, drafted from the State, also regulars and volunteers mobilized to serve our allies in the World War. The cases heretofore cited holding the bonuses and loans valid, all answer in the affirmative. Our government is a dual system—a wheel within a wheel—a union of indivisible states—a family of states. The Constitution of the United States is the golden cord that binds the states together—"United we stand, divided we fall." This is the conception of our government. Any attack upon the Government of the United States by insurrection or invasion, in its broad sense, is also an attack on each and every state government in the Union. It is the duty of each state to furnish her quota to repel the attack, although Congress

can alone declare war. The army and navy when raised and put into action, though the army and navy of the Union, is recruited by the states. To put down insurrection or invasion is a public benefit to every state as well as the Union. The war involved the safety and defense of every state and the Union. We are citizens of both our State and the United States. From the interwoven relation between the states and the Union, we are driven to the conclusion that payment to a soldier, sailor or marine serving in the American Army or Navy during the World War to repel invasion, under a liberal and just interpretation, is a public purpose of the State.

Animadverting to the question, it is well said in *S. v. Clausen, supra* (194 Pac. Rep., at p. 796): "In the spring of the year 1917 the aggressions of the Imperial German government had reached the point where the integrity of our institutions and the lives and property of the citizens of this country were in grave peril. Our ships had been sunk without cause upon the high seas, and our citizens killed while pursuing their lawful occupations. The matter, perhaps, cannot be better summed up than in the language of President Wilson in his address to the joint session of the two houses of Congress in (2) April, 1917, wherein, after reciting the illegal acts of the German nation, it was said: 'It is a war against all nations. American ships have been sunk, American lives taken, in ways which it has stirred us very deeply to learn of, but the ships and people of other neutral and friendly nations have been sunk and overwhelmed in the waters in the same way. There has been no discrimination. The challenge is to all mankind.' In the same address the President further said: 'We are accepting this challenge of hostile purpose because we know that in such a government, following such methods, we can never have a friend, and that in the presence of its organized power, always lying in wait to accomplish we know not what purpose, there can be no assured security for the democratic governments of the world.' Accordingly, on 6 April following, war was declared, and under acts of Congress the resources of this country, manual, economical, and financial, were coördinated for the purpose of meeting and overcoming the threatened peril and preserving the institutions of this country, and protecting the lives and property of the citizens thereof. It was into this cause that the men who are to receive compensation under the act in question entered under the selective draft. Services rendered in such a cause must necessarily be a public service."

In this famous war message, President Wilson proclaimed these principles as the ideals for which America would fight: "Our subject now, as then, is to vindicate the principles of peace and justice in the life of the world as against selfish and autocratic power, and to set up among the really free and self-governed peoples of the world such a concert of

purpose and of action as will henceforth insure the observance of those principles. . . . The world must be made safe for democracy. Its peace must be planted upon the tested foundations of political liberty. We have no selfish ends to serve. We desire no conquests, no dominion. We seek no indemnities for ourselves, no material compensation for the sacrifices we shall freely make. We are but one of the champions of the rights of mankind. We shall be satisfied when those rights have been made as secure as the faith and the freedom of nations can make them."

In *S. v. Johnson, supra* (176 N. W. Rep., at p. 225), the patriotic utterance is as follows: "Its purpose was to show by material means, of such character and such proportion that it could not be misunderstood as mere idle expressions, the deep gratitude of the people of the State to those who so signally and heroically performed the task that called them into action, and who stamped the American, the Wisconsin, soldier as of the bravest and most efficient among the soldiers of the world. But this purpose, though public, appropriate, and laudable, was not the sole or even the main purpose of the act. The main purpose was to stimulate patriotism, to quicken the perception in our citizens that there is a sacred duty to defend the government in time of need, as well as to demonstrate that such defense is appreciated; that republics are not ungrateful."

*We soon forget:* In the most stupendous war ever waged on this earth, we take statistics from the United States War Department, compiled 25 February, 1924: Total mobilized forces of the Allies were 42,188,810, of which 4,355,000 were Americans. Total casualties 22,094,900, average per cent 52.3—over one-half. Total mobilized forces of the Central Powers, Germany and others, 22,850,000; total casualties 15,404,477, average per cent 67.4—over two-thirds. Grand total forces mobilized 65,038,810; grand total casualties 37,499,377—average per cent 57.6. American Army battle casualties, killed in action 37,568; died of wounds received in action 12,942; wounded, not mortally, 182,674; total 233,184.

*Lest we forget:* North Carolina furnished 86,550; total casualties 6,773—about 1/14th of those called to the colors.

Hindenburg made a line which he believed no troops on this earth could break. It is an accredited fact that it was the 30th Division, composed almost entirely of North Carolina, South Carolina, and Tennessee troops that first made the objective and broke this line—(117th, 118th, 119th and 120th Infantry). To lead the assault for the 30th Division, the 119th and 120th were chosen—a majority North Carolina men.

General John J. Pershing, Commander of the American Expeditionary Forces, in his final report, says: "The Second Army Corps, Major-General Read commanding, with the 27th and 30th Divisions on

the British front, was assigned the task, in coöperation with the Australian Corps, of breaking the Hindenburg line at Le Cateau, where the San Quentin Canal passes through a tunnel under a ridge. In this attack, carried out on 29 September and 1 October (1918), *the 30th Division speedily broke through the main line of defense and captured all of its objectives,* while the 27th progressed until some of its elements reached Guoy."

General Sir John Monash, Commander of the Australian Corps, said: "The Corps Commander desires to make known to you this appreciation of the splendid fighting qualities of your division, and of the results accomplished in their part *in breaking this formidable portion of the Hindenburg line. It is undoubtedly due to the troops of this corps that the line was broken* and the operations now going on made possible. The unflinching determination of these men, their gallantry in battle and the results accomplished are an example for the future. They will have their place in history and must always be a source of pride to your people."

Sir Douglas Haig, Commander-in-Chief of the British, said: "On the 30th of September you took part with distinction in the *great and critical attack which shattered the enemy's resistance in the Hindenburg Line,* and opened the road to final victory. The deeds of the 27th and *30th American Divisions,* who on that day took Bellicourt and Nauroy, and so gallantly sustained the desperate struggle for Bony, will rank with the highest achievements of the war. They will always be remembered by the British regiments that fought beside you. I rejoice at the success which has attended your efforts, and am proud to have had you under my command."

*Lest we forget:* Seventy-eight Congressional medals of honor were given in the World War by the United States Government "For conspicuous gallantry and intrepidity above and beyond the call of duty in action with the enemy." Twelve men in the 30th Division from North Carolina, South Carolina and Tennessee received this medal—more than any other division. The three states, out of forty-eight in the Union, receiving 13 1/06 of the entire number.

Like the ex-soldier who argued this case for plaintiff, the American soldier responded to the call to colors, with a noble purpose to destroy the divine right of kings to rule, threatening the very life of this Republic, and to enthrone democracy—that equal rights and opportunities might prevail among all the people of the world, and that aristocracy of character may be the goal. Their reward was *duty well done.* A grateful people should ever remember their protectors. This is a legal and moral obligation, binding in law and conscience, and so considered from the foundation of this government, both in State and Nation.

This commonwealth has given no bonuses. A loan to purchase homes, to help make a State of home-owners, the foundation of stable government, is small recompense. Ten years ago the colors, the stars and stripes, were unfurled. Like the Crusaders of old, the heart of the Nation was stirred as never before, with the idea of service and sacrifice, that this gigantic struggle might end war by destroying autocracy and making democracy. The vision of the old prophet was the inspiration: "And he shall judge among the nations, and shall rebuke many people; and they shall beat their swords into plowshares, and their spears into pruninghooks; nation shall not lift up sword against nation, neither shall they learn war any more." And again the hope of fulfilling the ideal, when the world tuned in, and from Heaven was heard: "On earth, peace, good will toward men."

Our War President said, "The people of the world want peace, and they want it now, not merely by conquest of wars, but by agreement of mind. It was this uncomparably great object that brought me over seas." He died a martyr to this heroic purpose. Three thousand miles away, in the soil of France, rests the bodies of 30,000 Americans. In obedience they fell. Shall he and those heroes who died, die in vain?

> "To you from falling hands we throw
> The torch. Be yours to hold it high!
> If you break faith with us who die,
> We shall not sleep, though poppies grow
> 　　In Flanders Field."

Looking back we have a gesture towards a World Covenant of Peace, in which fifty-six nations have joined in a League of Nations, and only Russia, Mexico and the United States are outside. Like murder, the nations of the earth, by covenant, shall outlaw war.

The Loan Act for the World War Veterans, we think, constitutional. The judgment of the court below is

Affirmed.