IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-384

Filed: 15 September 2020

Wake County, No. 18 CVS 9806

NORTH CAROLINA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and CLEAN AIR CAROLINA, Plaintiffs.

v.

TIM MOORE, in his official capacity, and PHILIP BERGER, in his official capacity, Defendants.

Appeal by Defendants from order entered 22 February 2019 by Judge G. Bryan Collins, Jr., in Wake County Superior Court. Heard in the Court of Appeals 31 October 2019.

> *Southern Environmental Law Center, by Kimberley Hunter and David Neal, and Forward Justice, by Irving Joyner and Daryl V. Atkinson, for Plaintiffs.*

> *Nelson Mullins Riley & Scarborough LLP, by D. Martin Warf and Noah H. Huffstetler, III, for Defendants.*

DILLON, Judge.

The people reserved for themselves the sole right to amend our state constitution, N.C. CONST. art. I, § 3, but granted to our General Assembly the authority to pass bills proposing amendments for the people's consideration, N.C. CONST. art. XIII, § 4.

Plaintiff[1] commenced this action, seeking an order to void two of the four amendments ratified by the people during the November 2018 election. These amendments were proposed by our General Assembly during its 2017-18 Session. Plaintiff argues that the people should never have been allowed to vote on the amendments based on a 2017 decision in a federal case which declared that 28 members of our 170-member General Assembly had been elected from districts that were illegally gerrymandered based on race. *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd per curiam*, 137 S. Ct. 2211 (2017).

The superior court agreed and granted Plaintiff's motion for summary judgment, declaring the two challenged amendments ratified by the people void *ab initio*.[2] In its order, the superior court concluded that our "General Assembly lost its claim to popular sovereignty," did "not represent the people of North Carolina," and therefore was "not empowered to pass legislation that would [propose, for the people's consideration, amendments to] the state's constitution." The superior court, though, did not declare that our General Assembly was totally powerless to exercise

---

[1] When the complaint was filed, Clean Air Carolina was also a plaintiff, and there were twelve defendants. Prior to the summary judgment hearing and the trial court's order, there was a determination that Clean Air Carolina did not have standing to bring this claim, and other claims, and defendants were voluntarily dismissed after the 2018 election. Thus, this appeal includes the only parties remaining in the case.

[2] Plaintiff did not challenge nor did the superior court make any determination regarding the two other amendments ratified by the people that same day or any other bill passed by our General Assembly during the 2017-18 Session.

powers granted by our state constitution to the legislative branch, but only the power to pass bills proposing amendments to the people.

On appeal, Defendant argues that the superior court erred. We agree and reverse the order of the superior court.

## I. Background

During the 2017-18 Session, our General Assembly passed a number of bills, including six bills proposing various amendments to our state constitution. Two of those six bills proposed (1) an "<u>income tax cap amendment</u>," lowering the maximum income tax rate that could be imposed by our General Assembly from 10% to 7% and (2) a "<u>voter ID amendment</u>," which would allow our General Assembly to enact legislation requiring voters to present a valid photo ID in order to vote, but which would also allow our General Assembly to create exceptions to this requirement.

All six proposals were placed on the November 2018 ballot for the people's consideration. Over $9 million was raised by groups opposing all six proposed amendments, approximately $675,000 was raised to support the voter ID amendment, and no money was raised to support the income tax cap amendment.[3]

On 6 November 2018, the people ratified the income tax cap amendment by a margin of approximately 538,000 votes, with 57.35% voting in favor and 42.65%

---

[3] *Campaign Finance Report Search*, N.C. STATE BD. OF ELECTIONS & ETHICS ENF'T, https://www.ncsbe.gov/campaign-finance/search-campaign-funding-and-spending-reports-and-penalties (last visited Sept. 1, 2020).

voting against. And the people ratified the voter ID amendment by a margin of approximately 405,000 votes, with 55.5% voting in favor and 44.5% voting against. The people also ratified two of the other four proposals.[4]

Plaintiff commenced this present action challenging the income tax cap amendment and the voter ID amendment based on *Covington*. The issue before the superior court and which is now before us is <u>not</u> whether our General Assembly engaged in illegal gerrymandering. That issue was resolved in *Covington*. Rather, the issue here is whether, based on *Covington*, our General Assembly immediately lost its authority to exercise the power granted by our state constitution to our legislative branch to propose amendments to the people. However, a proper understanding of the issue before us requires an understanding of the gerrymandering issue resolved by *Covington*, which we now address.

Gerrymandering is the process by which the political party in control draws districts for some advantage.[5] The two main forms of gerrymandering practiced in our history are *partisan* gerrymandering and *racial* gerrymandering.

---

[4] The two other proposals ratified by the people dealt with gun rights and hunting and fishing rights. The two proposals rejected by the people would have transferred appointment power from our Governor to our General Assembly.

[5] The term was first used in 1812 by the *Boston Gazette*, a paper which supported the Federalist Party, to describe oddly shaped state senate districts. One of the districts was shaped like a salamander, designed to ensure the election of the political allies of Democratic-Republican governor Elbridge Gerry; hence the word "gerrymander." *See Vieth v. Jubelirer*, 541 U.S. 267, 274 (2004) (plurality opinion). Though Federalists won a comfortable majority in the overall statewide vote that year, the Democratic-Republicans remained in control of the Massachusetts State Senate due to the gerrymandering scheme.

*Partisan gerrymandering* occurs when the majority party draws districts for the purpose of increasing a party's *political* advantage in the legislature; for example, where districts are drawn to allow that party's candidates to win a supermajority (over 60%) of the seats even though their candidates in the aggregate statewide receive a bare majority of votes.

The United States Supreme Court recently declared that <u>partisan gerrymandering is legal</u>, holding that the issue presents a "political question beyond the reach of the [judicial branch]." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2499 (2019).[6]  In companion cases, the high Court upheld maps designed by our General Assembly to reduce Democratic Party influence and maps designed by Maryland's legislature to reduce Republican Party influence.  The high Court reasoned that "courts are not equipped to apportion political power as a matter of fairness, nor is there any basis for concluding that they were authorized to do so."  *Id.* at 2506.[7]

---

[6] Of course, any redistricting plan, whether involving partisan gerrymandering or not, where there are significant *population* differences among the districts is justiciable, as such a plan would violate the concept of "one person, one vote."  *Baker v. Carr*, 369 U.S. 186 (1962).

[7] What some consider "unfair" does not always equate to being "unconstitutional."

For instance, it may seem "unfair" to some that the allocation of United States Senators violates the "one-person, one-vote" principle; *e.g.* Wyoming and California are allocated the same number.  But such allocation is "constitutional," as the federal constitution expressly allocates two senators to each state.  U.S. CONST. art. I, § 3, clause 1.

And it may seem "unfair" that a political party is not entitled to a share of seats in our General Assembly in proportion to the number of votes its candidates receive statewide in the aggregate.  But such allocation is constitutional, as our state constitution does not provide for such proportional representation, but expressly empowers our General Assembly discretion to draw districts.  N.C. CONST. art. II, §§ 3, 5.

*Racial gerrymandering*, however, occurs when a "legislature's *predominant* motive for the design of [certain] district[s]" is *race*, rather than to achieve a partisan advantage. *Bethune-Hill v. Virginia*, 137 S. Ct. 788, 800 (2017) (emphasis added).

Racial gerrymandering is *generally* illegal. For example, a generation ago, the United States Supreme Court struck down maps designed by our General Assembly to *reduce* African American influence. *Thornburg v. Gingles*, 478 U.S. 30 (1986).

But the high Court held that racial gerrymandering may be legal *if* the legislature can demonstrate that its "districting legislation is narrowly tailored to achieve a compelling interest." *Bethune-Hill*, 137 S. Ct. at 801 (citation and quotation marks omitted). But absent a compelling interest, racial gerrymandering is illegal even if designed *to favor* a minority race. This is because "[r]acial classifications *of any sort* pose the risk of lasting harm to our society [as they] reinforce the belief [] that individuals should be judged by the color of their skin." *Shaw v. Reno*, 509 U.S. 630, 657 (1993) (emphasis added).

One "compelling interest" justifying racial gerrymandering is drawing districts to comply with Section 2 of the Voting Rights Act of 1965 ("VRA"), which prohibits districts that prevent a large group of minority voters living near each other from casting sufficient votes to elect a candidate of their choice. Accordingly, the VRA may require some "majority-minority" districts, where minority voters living near each other make up a majority in that district. *See Thornburg*, 478 U.S. at 50-51. But the VRA does not generally require a legislature *to maximize* the number of majority-

minority districts that are possible when developing maps. *Johnson v. DeGrandy*, 512 U.S. 997, 1016-22 (1994). And a plan which maximizes majority-minority districts is unconstitutional if the VRA can be complied with by creating fewer such districts, especially where minority voters in an area have the opportunity to elect a candidate of their choice through some compromise with other voters (where a minority group does not quite make up a majority of voters in the district).

> [Though] society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect the candidate of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute [(the VRA)] meant to hasten the waning of racism in American politics.

*Id.* at 1019-20.

Our General Assembly has a robust history of gerrymandering – both political and racial. Democrats engaged in gerrymandering when they controlled our General Assembly.[8] And Republicans have engaged in gerrymandering since regaining

---

[8] *Stephenson v. Bartlett*, 355 N.C. 354, 375, 562 S.E.2d 377, 392 (2002) (recognizing that "many North Carolina legislative districts have been increasingly gerrymandered to a degree inviting widespread contempt and ridicule").

control in 2011.[9]  Indeed, gerrymandering designed to protect incumbents has resulted in fewer truly competitive races:  in every election since 1996, over 90% of state legislative races have been decided by greater than 5% of the vote.[10]

Until 1968, no African Americans had served in our General Assembly in the 20th century.[11]  However, with the passage of the VRA in 1965, more African Americans began voting.  As a result, in 1968, Henry E. Frye (later our Chief Justice) became the first African American elected to our General Assembly in the 20th century.  But no more than six (6) African Americans (or 4% of the General Assembly) served at any one time over the next 15 years.  This underrepresentation was due in large part to illegal racial gerrymandering designed to suppress minority influence, a scheme which continued into the 1980s.  *Thornburg*, 478 U.S. at 80.  Specifically, our General Assembly divided concentrations of black voters into separate districts or lumped them with a larger contingent of white voters in multi-member districts. *Id.* at 38.  The few African American members serving during this period fought against these schemes.[12]

---

[9] *Rucho*, 139 S. Ct. at 2491 (quoting a legislator confessing, "I think electing Republicans is better than electing Democrats.  So I drew this map to help foster what I think is better for the country." (citation omitted)).

[10] *Electoral Competitiveness in North Carolina*, BALLOTPEDIA.

[11] During Reconstruction (1868-1898), 111 African Americans served in our General Assembly. *See* S.J. Res. 133, 151st Leg., (N.C. 2013) (titled "A Joint Resolution Honoring the Life and Memory [of a number of past African American members of the General Assembly], In Observance of African American History Month" and passing in both houses unanimously).

[12] Milton C. Jordan, *Black Legislators:  From Political Novelty to Political Force*, N.C. CENT. FOR PUB. POL'Y RSCH. n. 6 (Dec. 1989) https://nccppr.org/wp-content/uploads/2017/02/Black_Legislators-From_Political_Novelty_to_Political_Force.pdf (noting

In the 1980s the situation improved: our General Assembly drew maps which included several majority-minority districts. As a result, the number of African Americans elected quadrupled. By 1990, seventeen (17) African Americans were serving, making up 10% of our General Assembly.

Between 1991 and 2010, the General Assembly continued incorporating majority-minority districts in their maps, with seventeen (17) such districts in 1991. By 2009, this number decreased to nine (9), as African Americans were having greater success in electing candidates of their choice in districts where their voting population did not quite comprise a majority. *Covington v. North Carolina*, 316 F.R.D. at 125-26. This phenomenon allowed African American voters to be spread across more districts. During the 2009 Session, the number of African Americans serving in our General Assembly stood at 27, making up 16% of that body.

In the 2010 election, the Democratic Party lost control of the General Assembly for the first time since 1898. The number of African Americans elected that year decreased slightly from 27 to 24 members.

Upon taking control, the new Republican majority set out to draw new districts (based on the 2010 census) with the predominant motivation of protecting and increasing their new-found *partisan* advantage; that is, they sought to engage in partisan gerrymandering. *Rucho*, 139 S. Ct. at 2491. However, the new majority

---

that Rep. Kenneth "Spaulding and others fought against legislative redistricting plans preserving multi-member districts, which passed the legislature [during the 1981 Session.]").

recognized that, though it is not illegal to engage in partisan gerrymandering, *per se*, any new map would be illegal if it violated the VRA. Therefore, the new majority *increased* the number of majority-minority districts from nine (9) to thirty-two (32). As recognized in *Covington*, the "compelling purpose" of the new Republican majority in increasing majority-minority districts was to ensure that their maps would not run afoul of the VRA. *Covington v. North Carolina*, 316 F.R.D. at 125. Indeed, these new maps were ultimately approved ("pre-cleared") by the Department of Justice in 2011.

In the 2012 election, the first held under the new maps, Republicans were successful in their *partisan* gerrymandering efforts, achieving a "veto-proof" majority (over 60%) in each house.[13] At the same time, because of the increase in majority-minority districts, the number of African Americans serving in the General Assembly increased from 24 to 32 members, all Democrats.

*Covington*, upon which the superior court's order in this present case is based, commenced in 2015, where the plaintiffs sought a judicial order to break the gerrymandering efforts of the Republican majority. Specifically, a few dozen voters filed suit in federal court challenging 28 of the 32 majority-minority districts created by the Republican majority. *Covington v. North Carolina*, 316 F.R.D. at 128.

---

[13] These maps contained relatively few districts where Republican voters comprised a majority. Indeed, during this period, Republicans made up only about 30% of all voters statewide, compared to 40% being registered Democrat, and the remaining 30% registered as unaffiliated. However, Republicans drew the maps in such a way to give Republicans a greater chance of winning many districts where they could nominate a candidate more likely to appeal to unaffiliated and conservative Democratic voters.

In 2016, a federal panel assigned to the case declared that our General Assembly had engaged in illegal racial gerrymandering when it maximized the number of majority-minority districts, when maximization was not required by the VRA. *Covington v. North Carolina*, 316 F.R.D. 117. Judge James A. Wynn, Jr., writing for the panel, suggested that the maps might have been sustained had the Republican majority drawn *fewer* majority-minority districts. *Id.* at 178 ("Nor do we suggest that majority-black districts could not be drawn – lawfully and constitutionally – in some of the same locations as the [28] districts challenged in this case.").

In a second order, entered just after the November 2016 election, the federal panel fashioned a remedy for the illegal gerrymandering. Specifically, the panel ordered (1) that the terms of the 170 legislators elected in November 2016 be shortened to one year and (2) that special elections be held in 2017 based on *new*, legal maps to be drawn by the General Assembly. *Covington v. North Carolina*, No. 1:15-CV-399, 2016 WL 7667298 (M.D.N.C. Nov. 29, 2016).

The United States Supreme Court affirmed *per curiam* the panel's first order, finding the Republican maps illegally contained too many majority-minority districts. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017).

However, the high Court <u>vacated</u> the panel's remedial order, concluding that the panel did not consider all relevant factors in ordering a new election, and remanded the matter for further consideration. *North Carolina v. Covington*, 137 S.

Ct. 1624, 1625 (2017). On remand, the federal panel entered a new remedial order, directing new maps to be drawn, but determining that there was not enough time to order a special election prior to the regular 2018 election, thus allowing the members elected in 2016 under the illegal maps to complete their two-year terms. *Covington v. North Carolina*, 270 F.Supp.3d 881, 899-902 (M.D.N.C. 2017).

## II. Appellate Jurisdiction

All parties concede that we have appellate jurisdiction. We agree. The superior court's order granting Plaintiff's Motion for Partial Summary Judgment is a final order. The order granted Plaintiff the relief it sought. Although the Plaintiff's Amended Complaint included other claims regarding the wording of the ballot questions, Plaintiff voluntarily dismissed some claims and parties, and the other relief requested in the complaint is now moot. Accordingly, the trial court's order granted the declaratory judgment as requested by Plaintiff and is a final order.[14]

## III. Analysis

---

[14] We note that this appeal, as it relates to the voter ID amendment, was not mooted by our Court's opinion in *Holmes v. Moore*, ___ N.C. App. ___, 840 S.E.2d 244 (2020). That decision preliminarily enjoined the enforcement of the statute enacted by our General Assembly to give effect to the voter ID amendment previously ratified.

That is, the voter ID amendment authorized our General Assembly to implement the photo ID requirement and to provide exceptions. In response, our General Assembly passed a bi-partisan bill sponsored by three legislators. This statute provides (1) ten acceptable forms of identification for voting (*e.g.*, driver's license, passport, certain student IDs, veteran IDs, tribal enrollment cards, etc.), (2) a means by which a voter without an ID could obtain a state-issued ID for free, and (3) a means by which a voter could still vote without an ID by filling out an affidavit. *Holmes* enjoined the enforcement of this implementing statute, holding that its challengers had demonstrated that they were likely to succeed in showing that it was passed with the purpose of discriminating against African American voters. The injunction, though, was not permanent in nature and otherwise did not address the amendment itself.

Though our General Assembly has the power to enact laws, it has long been recognized that our judicial branch has the power to declare *a law* enacted by our General Assembly unconstitutional, *Bayard v. Singleton*, 1 N.C. 5 (1787), including a law which establishes unconstitutional legislative districts. *Stephenson v. Bartlett*, 355 N.C. 354, 362, 562 S.E.2d 377, 384 (2002). But it has never been recognized that our judicial branch has the power to deprive the General Assembly of authority to pass bills which are otherwise constitutional or any other authority granted that body by our state constitution, as it has never been recognized that our General Assembly has the power to pass a law depriving our branch of a power expressly granted to us by our state constitution. Indeed, the overwhelming, if not universal, authority compels our conclusion that the superior court here erred in declaring that the members of our General Assembly duly elected in 2016 lacked authority to pass bills proposing amendments for the people's consideration, a power expressly granted to our legislative branch by our state constitution.

For instance, when setting up our state government, the people declared that "legislative [] and judicial powers of the State government shall be forever separate and distinct from each other." N.C. CONST. art I, § 6. Our Supreme Court recently reiterated that "the separation of powers clause requires that, as the three branches of government carry out their duties, *one branch will not prevent another branch from performing its core functions*." *Cooper v. Berger*, 370 N.C. 392, 410, 809 S.E.2d 98, 108 (2018) (emphasis added) (citations and quotation marks omitted).

More to the point, our Supreme Court has expressly addressed and rejected the argument accepted by the superior court. Specifically, our high Court recognized that "judicial power" does not extend to the power to declare retroactively that our General Assembly lacked the authority to pass bills simply because some legislators were elected from unconstitutionally-designed districts, stating, "[q]uite a devastating argument, if sound." *Leonard v. Maxwell*, 216 N.C. 89, 99, 3 S.E.2d 316, 324 (1939). The Court characterized the question as "a political one, and there is nothing courts can do about it" and that "the authorities are against" it. *Id.* at 99, 3 S.E.2d at 324 (stating that courts "do not cruise in nonjusticiable waters").

Since *Leonard*, our Supreme Court has declared laws creating legislative districts to be unconstitutional based on illegal gerrymandering, but that Court has never suggested that our General Assembly could not otherwise continue exercising the powers granted to our state's legislative branch by our state constitution. For instance, in *Pender County v. Bartlett*, the Court declared a district to be illegally gerrymandered based on race, holding that the VRA did not require the district to be drawn as a majority-minority district. 361 N.C. 491, 649 S.E.2d 364 (2007). But the Court did not enjoin our General Assembly, nor the representative elected from the illegally-drawn district, from exercising legislative authority. In fact, the Court allowed *another election* (in November 2008) to occur under the unconstitutional maps, not requiring elections under new maps until 2010. *Id.* at 510, 649 S.E.2d at 376. *See also Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) (declaring

certain districts to be illegally gerrymandered but not ordering a special election nor enjoining the General Assembly from exercising legislative powers).

The federal panel in *Covington* did not believe that the 2017-18 Session of our General Assembly lost legitimacy, ordering the body it declared to be illegally gerrymandered to redraw the districts. *Covington*, 267 F.Supp.3d at 665. The *Covington* plaintiffs apparently did not believe so either, as they actually sought an order directing the General Assembly which they had successfully argued to be illegally gerrymandered to draw new districts. *Id.* And the United States Supreme Court apparently did not believe so, as it *vacated* the lower court's order to shorten the terms of those elected to the 2017-18 Session. *Covington*, 137 S. Ct. at 1625-26.

*Covington* is consistent with other United States Supreme Court jurisprudence, which recognizes that "a legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act[.]" *Baker v. Carr*, 369 U.S. 186, 250 n. 5 (1962) (Douglas, J. concurring) (citation omitted).[15] For instance, in *Connors v. Williams*, the Court held that elections held under an apportionment plan which violates the Fourteenth Amendment do not need to be invalidated. 404 U.S. 549, 550-551 (1972). In so holding, the Court cited an opinion

---

[15] Justice Douglas' footnote was cited with approval by the Court in *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). *See also Ryder v. United States*, 515 U.S. 177, 183 (1995) (stating that acts passed by a malapportioned legislature are not void); *Buckley v. Valeo*, 424 U.S. 1, 142 (1976) (stating that "legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan" still have "de facto validity"); *Maryland Committee v. Tawes*, 377 U.S. 656, 675-76 (1964) (allowing a malapportioned Maryland legislature to continue functioning and to draw new districts for the *next* election).

which held that an unconstitutionally apportioned legislature "should not be restrained from considering and passing such legislation as it considers necessary or proper in the public interest [until new legislators are seated]." *Mann v. Davis*, 238 F. Supp. 458 (E.D. Va. 1964), *aff'd sub nom*, *Hughes v. WMCA*, 379 U.S. 694 (1965).

Plaintiff, though, argues that the members of our 2017-18 General Assembly were "usurpers" based on the *Covington* decision. However, we are compelled to conclude that those serving were not usurpers. Rather, they were *de jure* officers, or at worst *de facto* officers, as they each had "at least a fair color of right or title to the [] office[.]" *In re Wingler*, 231 N.C. 560, 563, 58 S.E.2d 372, 374 (1950). The offices they purportedly held (state Representatives and Senators) are clearly established under our state constitution. All were elected and received their commissions. No one else held any *de jure* claim to the seats, no election was held to replace them prior to November 2018, and no order was entered removing any of them.

Even if they were serving merely as *de facto* officers, these legislators had the authority to exercise all the power that may be exercised by a *de jure* officer under the *de facto* doctrine consistently applied by our Supreme Court:

> The de facto doctrine is indispensable to the prompt and proper dispatch of governmental affairs. . . . An intolerable burden would be placed upon the incumbent of a public office if he were compelled to prove his title to his office to all those having occasion to all those having occasion to deal with him in his official capacity. [For example, the] administration of justice would be an impossible task if every litigant were privileged to question the lawful

- 16 -

> authority of a judge engaged in the full exercise of the functions of his judicial office.

*Id.* at 565-66, 58 S.E.2d at 376.

Our Supreme Court has routinely applied the *de facto* doctrine to uphold the acts of government officials, including judicial officers, even though performed by those statutorily ineligible to hold office. *See e.g.*, *People ex rel. Duncan v. Beach*, 294 N.C. 713, 242 S.E.2d 796 (1978) (judge serving well past the statutory mandatory retirement age); *State v. Lewis*, 107 N.C. 967, 972, 12 S.E. 457, 458 (1890) (sustaining a criminal conviction where the judge presiding was constitutionally ineligible to his office). That Court has also applied the doctrine to uphold acts of town councils whose members were elected under unconstitutionally void schemes, which allowed only landowners to vote. *Wrenn v. Kure Beach*, 235 N.C. 292, 295, 69 S.E.2d 492, 494 (1952); *Smith v. Carolina Beach*, 206 N.C. 834, 175 S.E. 313 (1934).

The superior court, here, essentially established a rule that our General Assembly only retains the authority to exercise constitutional powers which the judiciary determines are necessary to "avoid chaos and confusion" after it has been judicially determined that certain members of that body were elected from illegally gerrymandered districts. Nothing in our jurisprudence suggests that the judiciary can unilaterally strip the legislative branch of *some* of its constitutional powers. We cannot pick and choose which laws (otherwise constitutional) we prefer, or which laws are necessary to avoid chaos and confusion. Either our General Assembly has the

authority to act as our state's legislature, or it does not. Certainly, our legislative branch cannot enact a law which deprives our Supreme Court of certain powers expressly granted by the state constitution or enact a law which deprives the Governor of certain constitutional powers granted to the executive branch.

We do not agree that our "General Assembly lost its claim to popular sovereignty" based on the reasoning that "under the illegal racial gerrymandering, a large swath of North Carolina citizens lack a constitutionally adequate voice in the State's legislature." If there was a loss of popular sovereignty by our General Assembly, then *all* the laws passed by that body would be subject to attack, thus creating chaos and confusion. One might argue that our current state constitution, adopted in 1971, was void, as it was proposed by a General Assembly that had only one African American member due to the impact of gerrymandering and voter suppression measures. We do not condone the creation of more majority-minority districts than that required by the VRA as it reduces the ability of minority voters to have more influence in other districts. We note, though, notwithstanding the harm created by the illegal gerrymandering, that the maps created in 2011 resulted in more African Americans being elected to the General Assembly than ever before.

We disagree with the superior court's reasoning that "[t]he requirements for amending the state Constitution are unique and distinct from the requirements to enact other legislation" and, as such, our General Assembly can exercise the authority to propose amendments "only insofar as it has been bestowed with popular

sovereignty." Rather, *each* power granted to our General Assembly is "unique and distinct." We see nothing in the language of our state constitution empowering our branch to "blue pencil" the powers of our legislative branch. Indeed, our state constitution empowers our General Assembly to pass many types of bills: bills which become law as part of our General Statutes, pursuant to Article II, § 22(1); bills which become law as part of our state constitution pursuant to Article II, § 22(2); and bills which become law as part of our federal constitution, pursuant to Article II, § 22(3).

If we had such power to engage in "blue penciling" the legislative powers contained in Article II, it might make more sense that we blue pencil our General Assembly's power to pass regular bills. The risk of a bill becoming law is much greater, as those can become law without the consent of anyone else, through veto-override. A bill proposing an amendment, however, cannot become law without the approval of the people, the source of popular sovereignty.

## IV. Conclusion

We conclude that the superior court erred in holding that our General Assembly lost its power granted by our state constitution, while retaining other powers, simply because a federal court had determined that the maps contained too many majority-minority districts, such that some members elected to that body were from districts that were illegally gerrymandered based on race. It is simply beyond our power to thwart the otherwise lawful exercise of constitutional power by our legislative branch to pass bills proposing amendments. Accordingly, we reverse the

order of the superior court and declare the challenged constitutional amendments duly ratified by the people to be valid.

REVERSED.

Judge STROUD concurring. writing separately.

Judge YOUNG dissenting, writing separately.

No. COA19-384 – *NC State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Moore*

STROUD, Judge, concurring.

I concur in the result reached by majority opinion but write separately because I would reach the same result on a more limited basis. This Court is "an error-correcting body, not a policy-making or law-making one." *Connette v. Charlotte-Mecklenburg Hospital Authority*, ___ N.C. App. ___, ___, 845 S.E.2d 168, 172 (2020) (citation and quotation marks omitted). Our role is to review the trial court's order to determine if the ruling is supported by existing precedential law as stated in North Carolina's Constitution, caselaw, or statutes. *See generally id.* Neither this Court nor the trial court has the authority to declare new law which suits our own policy preferences. *See generally id.* In our role as an error-correcting court, this Court has no power to affirm the trial court's order because it is not based upon law. *See generally id.*

As noted by the majority, "[t]he superior court's rationale in declaring our General Assembly illegitimate" was based almost exclusively upon *Covington* which was affirmed by a memorandum decision from the United States Supreme Court, "in which that Court determined that 28 members of the 170-member General Assembly were elected from districts" illegally and racially gerrymandered. *See Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211, 198 L. Ed. 2d 655 (2017). Although *Covington* is not directly related to the plaintiff's claim in this

case, also as noted by the majority, it was the legal basis for plaintiff's contention and the trial court's determination that the General Assembly "ceased to be a legislature with any *de jure* or *de facto* lawful authority, and assumed usurper status[,]" thus rendering the challenged constitutional amendments void. *See generally id.* But *Covington* does not support that trial court's conclusion that the General Assembly elected in that case had no *de jure* or *de facto* authority to act to pass a bill proposing a constitutional amendment or any other legislation. *See generally id.* To the contrary, *Covington* ultimately declined to conclude that the members of the General Assembly elected in unconstitutionally gerrymandered districts are usurpers but instead ordered the same exact General Assembly the trial court deemed without *de jure* or *de facto* authority to create new districts with no limitations on the General Assembly's authority to act. *See id.* at 176-78. There is no North Carolina law to support the trial court's legal conclusions.

**Standard of Review**

The summary judgment order on appeal grants a declaratory judgment. Where there is no dispute regarding the material facts, "[s]ummary judgment is an appropriate procedure in a declaratory judgment action. *Montgomery v. Hinton*, 45 N.C. App. 271, 262 S.E.2d 697 (1980)." *Pine Knoll Association v. Cardon*, 126 N.C. App. 155, 158, 484 S.E.2d 446, 448 (1997). This Court's standard of review is *de novo. See Craig ex rel. Craig v. New Hanover County Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009). The legal issues presented are constitutional questions,

2

which we also review *de novo*, but "[i]n exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond reasonable doubt." *Cooper v. Berger*, 256 N.C. App. 190, 193, 807 S.E.2d 176, 178 (2017), *aff'd*, 371 N.C. 799, 822 S.E.2d 286 (2018); *see also Hinton v. Lacy*, 193 N.C. 496, 499-500, 137 S.E. 669, 671-72 (1927) ("'While the courts have the power, and it is their duty, in proper cases to declare an act of the Legislature unconstitutional it is a well-recognized principle that the courts will not declare that this co-ordinate branch of the government has exceeded the powers vested in it unless it is plainly and clearly the case. *If there is any reasonable doubt it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.* It cannot be said that this act is plainly and clearly unconstitutional. The doubt, if any, must be resolved in favor of the General Assembly.' Every presumption is in favor of the constitutionality of an act of the Legislature, and, without the clearest showing to the contrary, it should be sustained. It is to be presumed that the law-making body were mindful of their oaths, and acted with integrity and honest purpose to keep within the constitutional limitations and restrictions. The breach of the Constitution must be so manifest as to leave no room for reasonable doubt." (emphasis in original) (citations omitted)).

## Legal Basis of the Trial Court Order

A general outline of the trial court's order and a review of its conclusions of law demonstrate that *Covington* was essentially the *only* legal basis for the trial court's

decree. The order's section on "Findings of Fact" includes a sub-section entitled, "2018 Constitutional Amendment Proposals[.]" The first several paragraphs of the findings recite the claims, history, and court rulings of the *Covington* case. Thereafter, many findings of fact recite the chronology of the adoption of the proposed constitutional amendments, the filing of the complaint in this case, the procedural history of this case, and a description of plaintiff and its interest in challenging the amendments.[16]

The trial court's order then makes several conclusions of law; the following are pertinent to the issues raised on appeal:

> 3. Whether an unconstitutionally racially-gerrymandered General Assembly can place constitutional amendments onto the ballot for public ratification is an unsettled question of state law and a question of first impression for North Carolina courts.
> . . . .
>
> 5. N.C. Const art I sec. 3 states that the people of North Carolina "have the inherent, sole, and exclusive right of regulating the internal government and . . . of altering . . . their Constitution and form of government whenever it may be necessary to their safety and happiness" *Id.* § 3 (emphasis added). N.C. Const art XIII mandates that this may be accomplished only when a three-fifths supermajority of both chambers of the General Assembly-vote to submit a constitutional amendment for public ratification, and the public then ratifies the amendment. The requirements for amending the state Constitution are unique and distinct from the requirements to enact other legislation. The General

---

[16] The trial court order notes that a three-judge panel had previously determined plaintiff CAC did not have standing in the case.

Assembly has the authority to submit proposed amendments to the Constitution only insofar as it has been bestowed with popular sovereignty.

6. On June 5, 2017, it was adjudged and declared by the United States Supreme Court that the General Assembly was an illegally gerrymandered body. At that time, following "the widespread, serious, and longstanding . . . constitutional violation--among the largest racial gerrymanders ever encountered by a federal court—" the General Assembly lost its claim to popular sovereignty. *Covington*, 270 F. Supp. 3d at 884. The three-judge panel in Covington ruled that, under the illegal racial gerrymander, "a large swath of North Carolina citizens . . . lack a constitutionally adequate voice in the State's legislature . . . ." *Covington v. North Carolina*, 1: 15CV399, 2017 WL 44840 (M.D.N.C. Jan. 4, 2017) (order for special elections vacated and remanded, *North Carolina v. Covington*, 137 S. Ct. 1624 (June 5, 2017)).

7. Curing this widespread and sweeping racial gerrymander required that over two-thirds of the North Carolina House and Senate districts be redrawn. Thus, the unconstitutional racial gerrymander tainted the three-fifths majorities required by the state Constitution before an amendment proposal can be submitted to the people for a vote, breaking the requisite chain of popular sovereignty between North Carolina citizens and their representatives.

8. Accordingly; the constitutional amendments placed on the ballot on November 6, 2018 were approved by a General Assembly that did not represent the people of North Carolina. Indeed, "[b]y unjustifiably relying on race to distort dozens of legislative district lines, and thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans [under which that General Assembly had been elected] interfered with the very mechanism by which the people confer their sovereignty on the General Assembly and hold the General Assembly accountable." 270 F. Supp. 3d at 897. The November 2018 general

elections under remedial legislative maps were "needed to return the people of North Carolina to their sovereignty." *Id.*

9.    Defendants argue that, even following the *Covington* decision, the General Assembly maintained authority to enact legislation so as to avoid "chaos and confusion." *See Dawson v. Bomar*, 322 F.2d 445 (6th Cir. 1963). It will not cause chaos and confusion to declare that Session laws 2018-119 and 2018-128 and their corresponding amendments to the constitution are void *ab initio*.

10.    An illegally constituted General Assembly does not represent the people of North Carolina and is therefore not empowered to pass legislation that would amend the state's Constitution.

11.    N.C. Session Laws 2018-119 and 2018-128, and the ensuing constitutional amendments, are therefore void *ab initio*.

Thus, the trial court relied upon *Covington* to support its conclusions of law, although the order also noted some provisions of the North Carolina Constitution. I will first address why *Covington* does not support the trial court's order.

**Covington recognized the absence of state law to support Plaintiff's usurper argument.**

Plaintiff's complaint here requested a declaratory judgment, specifically "a declaration that following the U.S. Supreme Court's mandate in *Covington v. North Carolina*, the N.C.G.A. ceased to be a legislature with any *de jure* or *de facto* lawful authority and assumed usurper status." The U.S. Supreme Court's mandate affirming the *Covington* lower court's opinion was issued on 5 June 2017, *see*

*Covington*, 137 S. Ct. 2211, 198 L. Ed. 2d 655, but the unconstitutionally gerrymandered districts were created in 2011. *Covington*, 316 F.R.D. at 124. Thus, the logical conclusion of plaintiff's theory of usurper status would be that North Carolina has not had a General Assembly with any authority to act since at least 2011 as North Carolina held elections based upon the 2011 districts addressed in *Covington*, some of which were determined to have been unconstitutionally racially gerrymandered. *See generally id.*, 316 F.R.D. 117. Although only 28 districts were challenged in *Covington*, redrawing the districts would also affect other districts, so over half of the House and Senate districts would have to be redrawn. *See Covington, v. North Carolina*, 270 F. Supp. 3d 881, 888 (M.D.N.C. 2017) ("In particular, although this Court's order focused on the boundaries of the twenty-eight majority-minority districts, the parties agree that the inevitable effect of any remedial plan on the lines of districts adjoining the twenty-eight districts—coupled with the North Carolina Constitution's requirement that district lines not traverse county lines, unless such a traversal is required by federal law, see Stephenson v. Bartlett, 355 N.C. 354, 562 S.E.2d 377, 396–98 (2002)—means that the well over half of the state House and Senate districts must be redrawn.").

The primary problem with plaintiff's reliance upon *Covington* for its contention that North Carolina, as of August 2016, effectively had no General Assembly, is that neither the lower federal court nor the United States Supreme Court considered the General Assembly, even as elected under the rejected districting plan to be usurpers

7

with no *de jure* or *de facto* legal authority*;* this is true even though the *Covington* plaintiffs made this same argument in *Covington* for limitation of the General Assembly's authority. *See Covington*, 316 F.R.D. 117; *see also Covington*, 137 S. Ct. 2211, 198 L. Ed. 2d 655. Further, the plaintiff in *this* case, as *amicus curiae* in *Covington*, made the same arguments in support of the request for special elections so a new General Assembly could be elected in new districts to take additional action. *See Covington v. North Carolina*, 270 F. Supp. 3d 881, 901 (M.D.N.C. 2017). But the federal court ultimately rejected the request for special elections because it would "unduly harm North Carolina voters" due to "insufficient time to enact and review remedial redistricting plans[], . . . voter confusion and, likely, poor voter turnout." *Id.*

The trial court noted in its conclusions of law this case presented an issue of first impression: "Whether an unconstitutionally racially-gerrymandered General Assembly can place constitutional amendments onto the ballot for public ratification is an unsettled question of state law and a question of first impression for North Carolina courts." The trial court then relied upon *Covington* to support its ruling, and the relevant conclusions of law stated:

> 6. On June 5, 2017, it was adjudged and declared by the United States Supreme Court that the General Assembly was an illegally gerrymandered body. At that time, following "the widespread, serious, and longstanding . . . constitutional violation--among the largest racial gerrymanders ever encountered by a federal court—" the General Assembly lost its claim to popular sovereignty. Covington, 270 F. Supp. 3d at 884. The three-judge panel in Covington ruled that, under the illegal racial

gerrymander, "a large swath of North Carolina citizens . . . lack a constitutionally adequate voice in the State's legislature . . . ." Covington v. North Carolina, 1: 15CV399, 2017 WL 44840 (M.D.N.C. Jan. 4, 2017) (order for special elections vacated and remanded, North Carolina v. Covington, 137 S. Ct. 1624 (June 5, 2017)).

7.      Curing this widespread and sweeping racial gerrymander required that over two-thirds of the North Carolina House and Senate districts be redrawn. Thus, the unconstitutional racial gerrymander tainted the three-fifths majorities required by the state Constitution before an amendment proposal can be submitted to the people for a vote, breaking the requisite chain of popular sovereignty between North Carolina citizens and their representatives.

8.      *Accordingly,* the constitutional amendments placed on the ballot on November 6, 2018 were approved by a General Assembly that did not represent the people of North Carolina. Indeed, "[b]y unjustifiably relying on race to distort dozens of legislative district lines, and thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans [under which that General Assembly had been elected] interfered with the very mechanism by which the people confer their sovereignty on the General Assembly and hold the General Assembly accountable." 270 F. Supp. 3d at 897. The November 2018 general elections under remedial legislative maps were "needed to return the people of North Carolina to their sovereignty." *Id.*

(Emphasis added.)

And although the trial court relied almost solely upon *Covington* for its conclusion that "[a]n illegally constituted General Assembly does not represent the people of North Carolina and is therefore not empowered to pass legislation that would amend the state's Constitution" the fact remains that *Covington* explicitly

declined to address this "unsettled question of state law[,]" and thus did not create

any state law for the trial court, or this Court, to follow:

> Plaintiffs and the NAACP, as amicus curiae, nonetheless argue that the potential for disruption factor weighs in favor of ordering a special election because the Supreme Court's summary affirmance of this Court's decision calls into question, as a matter of state law, the authority of legislators elected in unconstitutional districts to legislate. Pls.' Suppl. Br. on Remedies at 5. In particular, according to Plaintiffs, "officers elected pursuant to an unconstitutional law are 'usurpers' and their acts are absolutely void." Id. (quoting In re Pittman, 151 N.C. App. 112, 564 S.E.2d 899, 901 (2002)).[17] Plaintiffs maintain that because nearly 70% of the districts must be redrawn to remedy the unconstitutional districting plans, the state Senate and House, as currently composed, lack the power to act. See id. at 5–8.
>
> We agree with Plaintiffs that the absence of a legislature legally empowered to act would pose a grave disruption to the ordinary processes of state government. But *Plaintiffs cite no authority from state courts definitively holding that a legislator elected in an unconstitutionally drawn district is a usurper, nor have we found any. On the contrary, Plaintiffs concede that whether the General Assembly, as currently composed, is empowered to act is an unsettled question of state law.* See id. at 7. Given that this argument implicates an unsettled question of state law, Plaintiffs and Amici's argument is more appropriately directed to North Carolina courts, the final arbiters of state law.

*Id.* (Emphasis added). Further, there simply is no state law to support the proposition

that the legislators of North Carolina are usurpers. The trial court thus undertook

---

[17] *In re Pittman* does not support plaintiff's argument; it discusses the difference between *de facto* and *de jure* authority when a former district court judge signed an order after the expiration of her term and another judge had already been sworn into the same seat. *See generally In re Pittman*, 151 N.C. App. 112, 564 S.E.2d 899 (2002).

to create some new state law, purportedly based upon *Covington*. But North Carolina does have law regarding *de facto* and *de jure* authority of elected officers, as discussed by the majority opinion, and that law does not support the trial court's conclusions.

**Covington ordered the General Assembly to create new districts and did not limit its legislative authority**.

A further problem with both plaintiff's and the trial court's reliance on *Covington* for its contention that North Carolina effectively had no General Assembly at the time the amendments were ratified by the people of North Carolina, is that neither the lower federal court nor the United States Supreme Court considered the General Assembly, even as elected under the illegally gerrymandered plans, to have assumed "usurper status" with no *de jure* or de *facto* legal authority. *See Covington*, 316 F.R.D. 117; *see also Covington*, 137 S. Ct. 2211, 198 L. Ed. 2d 655.

First, in *Covington*, while the federal court acknowledged that "Plaintiffs have asked for an immediate injunction blocking the use of the unconstitutional districts in any future elections" so that the illegally constituted General Assembly would not be allowed to continue to exist and legislate any longer than absolutely necessary, the court denied this request "despite the[] unconstitutionality" of the plans:

> Based on the schedules put forth by the parties in their post-trial briefing, we regrettably conclude that due to the mechanics of state and federal election requirements, there is insufficient time, at this late date, for: the General Assembly to draw and enact remedial districts; this Court to review the remedial plan; the state to hold candidate filing and primaries for the remedial districts; absentee ballots to be generated as required by

11

statute; and for general elections to still take place as scheduled in November 2016.

When necessity so requires, the Supreme Court has authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to constitutional requirements. After careful consideration, and with much reluctance, we conclude that necessity demands such a result today. We decline to order injunctive relief to require the state of North Carolina to postpone its 2016 general elections, as such a remedy would cause significant and undue disruption to North Carolina's election process and create considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials. Instead, like other courts confronted with similarly difficult circumstances, we will allow the November 2016 elections to proceed as scheduled under the challenged plans, despite their unconstitutionality.

*Id.* at 177–78 (citations, quotation marks, ellipses, and brackets omitted).

Second, the federal court acknowledged the authority of the unconstitutionally formed General Assembly as it ordered this very Assembly to take legislative action and redraw the plans:

Nonetheless, Plaintiffs, and thousands of other North Carolina citizens, have suffered severe constitutional harms stemming from Defendants' creation of twenty-eight districts racially gerrymandered in violation of the Equal Protection Clause. These citizens are entitled to swift injunctive relief.

Therefore, *we hereby order the North Carolina General Assembly to draw remedial districts in their next legislative session to correct the constitutional deficiencies in the Enacted Plans*. By separate order, we will direct the parties to file supplemental briefs on an appropriate deadline for such action by the legislature, on whether additional or other relief would be appropriate before the

> regularly scheduled elections in 2018, and, if so, the nature
> and schedule of that relief.

*Id.* at 177–78 (emphasis added). Thus, in summary, the federal court acknowledged the unconstitutionality of North Carolina's illegally gerrymandered districts and simultaneously ordered the Assembly elected from those districts to take legislative action to correct the issue rather than ordering a new election or limiting its authority to take further legislative actions. *See generally id.*

**Acceptance of plaintiff's argument would create chaos.**

Understandably, plaintiff limits its argument as to the General Assembly's lack of legal authority to the two constitutional amendments they oppose; they recognize the logical conclusion of the argument if it is not limited.[18] But there is no law to support this argument and no logical way to limit the effect of the electoral defects noted in *Covington* to one, and only one, type of legislative action, and more specifically to just these two particular amendments which plaintiff opposes. To the extent a rational argument could be made to support a theory that only one type of legislative action is without authority, such an argument would be most likely to fail regarding constitutional amendments as this is a specific type of legislative action

---

[18] Plaintiffs' amended complaint states their claim as follows: "Plaintiffs seek a declaratory judgment that, pursuant to the U.S. Supreme Court's June 30, 2017, mandate in Covington, the N.C.G.A. ceased to be a legislature with any de facto lawful authority and assumed usurper status. To the extent that they had any power to act, it was limited to those acts necessary to avoid chaos and confusion, such as acts necessary to conduct the day-to-day business of the state, but the usurper N.C.G.A. may not take steps to modify the N.C. Constitution. Art I § 2, 3, 35 and Art XIII § 4."

that must be and was approved by a majority of the *voters* in North Carolina in a statewide election. The popular vote provides an additional layer of protection.

The majority opinion has addressed the General Assembly's *de facto* or *de jure* authority to pass laws, but I would note that neither plaintiff nor our dissenting colleague has cited any applicable legal authority holding a legislative body can lack *de facto* or *de jure* authority for one purpose only but retain authority for all other purposes such as regular bills and budgets, *unless* a court has so directed. For example, in *Butterworth v. Dempsey*, a federal court enjoined the Connecticut General Assembly "from doing any act or taking any steps in furtherance of nominating or holding elections of senators or representatives to the Senate or House of Representatives of the State of Connecticut," and taking other delineated legislative actions, although the injunction was stayed so long as the General Assembly complied with the specific timeline and steps set out by the court for redistricting for elections. *See Butterworth*, 237 F. Supp. 302, 310-11 (1964). The federal court in *Covington* could have adopted this same sort of procedure used in *Butterworth* and limited the General Assembly's authority until the new districts were adopted or new elections held, *see generally id.*, but instead the *Covington* court simply directed the General Assembly to redraw the districts and did not limit the General Assembly's authority. *Covington*, 316 F.R.D. at 177-78.

The trial court also sought to limit its own ruling to specifically the two challenged amendments by rejecting in one sentence the defendants' argument as to the logical ramifications of its ruling:

> 9. Defendants argue that, even following the *Covington* decision, the General Assembly maintained authority to enact legislation so as to avoid "chaos and confusion." *See Dawson v. Bomar*, 322 F.2d 445 (6th Cir. 1963). It will not cause chaos and confusion to declare that Session laws 2018-119 and 2018-128 and their corresponding amendments to the constitution are void *ab initio*.

The trial court did not attempt to explain *why* it rejected defendants' argument of "chaos and confusion" from a ruling declaring legislative actions void, perhaps because there is no law to support this conclusion, as recognized in *Dawson v. Bomar*, 322 F.2d 445, 447–48 (6th Cir. 1963) ("As indicated by the petitioner's failure to cite authority in support of his contention, the courts have uniformly held that otherwise valid enactments of legislatures will not be set aside as unconstitutional by reason of their passage by a malapportioned legislature.").

Neither this Court nor the trial court can limit the effect of its ruling to these two amendments. Just saying the ruling is limited does not make it so. Now that the order has been appealed, its effect cannot be contained to this one case, and the precedential effect of this Court upholding the trial court's order would lead to the "chaos and confusion" the trial court was attempting to avoid. (Quotation marks omitted). If this Court were to uphold the trial court order and conclude the General

15

Assembly was a usurper with no authority to act as to the two constitutional amendments plaintiff opposes, this opinion would provide authority to support legal challenges to every single legislative action taken by the General Assembly as elected based upon the 2011 districts. Our ruling could also support claims challenging other laws adopted before 2011, since 2011 was far from the first time districts in North Carolina were illegally and unconstitutionally gerrymandered.

The Tenth Circuit Court of Appeals described the potential chaos and confusion from a ruling holding that a legislature elected in illegal districts has no authority in *Ryan v. Tinsley*, 316 F.2d 430 (10th Cir. 1963). The "chaos" noted by the circuit court would *not* result from granting relief to the single petitioner in that case but from the effect such a ruling would have on other disputes. *See generally id.* The circuit court rejected an argument of the legislature's lack of authority based upon unconstitutional districts when a petitioner made a habeas corpus claim based upon the premise that the apportionment of the Colorado legislature violated both the state and federal constitutions, and thus it had no authority to convict him under the Colorado Habitual Criminal Act:

> The sole issue is one of law — whether statutes passed by an unconstitutionally apportioned legislature are constitutional. If they are, all the contentions of the petitioner fall by the wayside.
>     . . . .
>     *An acceptance of the contentions of the petitioner would produce chaos.* A presently unascertainable number of Colorado statutes would be nullified. Property rights would be jeopardized. The marital status of many

individuals would be questionable. Tax statutes would be unenforceable. The prison gates would be thrown open. The maintenance of law and order would be imperilled. Government would exist in name only. A recognition of the consequences compels rejection of the arguments.

*Id.* at 431-32 (Emphasis added).

*Covington* acknowledges the judiciary's struggle with correcting the effects of unconstitutional gerrymandering, and there are no easy fixes, as outlined by the majority opinion. *See generally Covington*, 316 F.R.D. 117. But in this instance, acceptance of the plaintiff's contentions *would* produce chaos. In *Covington*, the federal court and the United States Supreme Court ordered corrective action but *declined* the request of the plaintiff to direct corrective action by some means other than action by the duly elected General Assembly, despite its unconstitutionally gerrymandered districts; *Covington* does not support the trial court's order but instead supports the opposite result. *See Covington*, 316 F.R.D. 117; *see also Covington*, 137 S. Ct. 2211, 198 L. Ed. 2d 655.

**The North Carolina Constitution does not support the trial court's conclusions.**

The trial court's order also cited some provisions of the North Carolina Constitution in support of its conclusions. The trial court noted the following constitutional provisions in its "findings of fact":

> 5. N.C. Const art I sec. 3 states that the people of North Carolina "have the inherent, sole, and exclusive right of regulating the internal government and . . . of altering . . . their Constitution and form of government

> whenever it may be necessary to their safety and happiness" *Id.* § 3 (emphasis added). N.C. Const art XIII mandates that this may be accomplished only when a three-fifths supermajority of both chambers of the General Assembly-vote to submit a constitutional amendment for public ratification, and the public then ratifies the amendment. The requirements for amending the state Constitution are unique and distinct from the requirements to enact other legislation. The General Assembly has the authority to submit proposed amendments to the Constitution only insofar as it has been bestowed with popular sovereignty.

The provisions cited by the trial court's order do not support its conclusion that an illegally gerrymandered General Assembly lacks either *de facto* or *de jure* authority to approve a bill for submission of constitutional amendments to popular vote but it still has full authority to pass any other kind of legislation. As noted in *Covington*, there is *no* North Carolina law interpreting the North Carolina Constitution in a way that could support the trial court's conclusion. *See Covington*, 270 F. Supp. 3d at 901. The sections of the North Carolina Constitution cited simply address the method of adopting a constitutional amendment. True, the process for a constitutional amendment differs from the adoption of a bill or a budget, but if the General Assembly lacked authority to pass a bill for submission of a constitutional amendment to the voters, it surely lacks authority to pass other bills as well. Since passing a constitutional amendment requires a majority of the voters of North Carolina in a statewide election unaffected by illegal districts, plaintiff's argument is actually weaker for a constitutional amendment than for other ordinary legislation

18

without these additional protections. Ironically, despite the approval of the challenged amendments by large majorities of "the people of North Carolina," the trial court held the amendments to be invalid because the General Assembly "does not represent *the people of North Carolina* and is therefore not empowered to pass legislation that would amend the state's Constitution." If the General Assembly lacked *de jure* and *de facto* authority to pass a bill proposing a constitutional amendment for approval by popular vote, the General Assembly also lacks authority to pass any legislation or budget which must be approved only by a majority vote and which is not subject to popular vote. Thus, the North Carolina Constitution does not support the trial court's holding.

I therefore concur in the result reached by the majority based on the rationale of this concurring opinion.

No. COA19-384 – *NC State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Moore*

YOUNG, Judge, dissenting.

For the following reasons, I must respectfully dissent.

This case presents a compelling issue of first impression before this Court, one which, due to its subject matter, demands the utmost attention and scrutiny. At issue is a narrow question, but one vital to our democracy: Can a legislature, which has been held to be unconstitutionally formed due to unlawful gerrymandering, act to amend the North Carolina Constitution?

The ramifications of such an act are clear. If an unlawfully-formed legislature could indeed amend the Constitution, it could do so to grant itself the veneer of legitimacy. It could seek, by offering amendments for public approval, to ratify and make lawful its own unlawful existence. Such an act would necessarily be abhorrent to all principles of democracy.

Indeed, I find little merit to the arguments of the defendant-appellants. They contend, for example, that this matter is a political question, forever out of the reach of the judiciary. While this was once held to be true, that is no longer the case. In 1962, the United States Supreme Court held that challenges to the apportionment of a state legislature under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution were justiciable, and therefore that the courts had a role in determining such issues. *Baker v. Carr*, 369 U.S. 186, 201, 7 L. Ed. 2d. 663,

676 (1962) (holding that "[a]n unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature"). The courts of this State have since followed the example set in *Baker*. *See e.g. Woodard v. Carteret Cnty.*, 270 N.C. 55, 153 S.E.2d 809 (1967). Indeed, the case underlying many of the legal issues before us, *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *summarily aff'd*, 581 U.S. ___, 198 L. Ed. 2d 655 (2017) (*Covington I*), involved judicial review of the apportionment of the legislature. It cannot reasonably be said that the apportionment of the legislature remains a political question when it is clear that the courts have a role to play in the oversight of such decisions.

Likewise, with regard to the argument by defendant-appellants that the trial court erred in "determining that the General Assembly was a body of usurpers incapable of passing laws," I find these contentions unconvincing. Somewhat ironically, defendant-appellants rely upon the "chaos and confusion" argument of *Dawson v. Bomar*, 322 F.2d 445 (6th Cir. 1963). However, the trial court relied upon this very same argument in limiting its order, noting that "[i]t will not cause chaos and confusion to declare that Session laws 2018-119 and 2018-128 and their corresponding amendments to the constitution are void *ab initio*."

Indeed, to uphold the determination of the trial court, our holding need not be a broad one. As plaintiff-appellees recognize, the trial court's order would not impact any legislative action taken prior to the Supreme Court's determination in *Covington*

*I* that the General Assembly was unconstitutionally formed upon unlawful gerrymandering. Those laws enacted prior to that determination would go unchallenged.

Moreover, per the "chaos and confusion" rule, we need not hold that *all* legislative acts since that determination are unlawful and void. Certainly, those actions taken in the ordinary course of legislative business must be permitted to stand, as to allow otherwise would create anarchy. For defendant-appellants to suggest that this Court's ruling would permit that is without merit.

Rather, the only relief required here – the very relief granted by the trial court – is that we must hold void only those actions taken by the legislature *which sought to amend our Constitution*. Those actions, and only those, strike the heart of our democracy. Only a legislature formed by the will of the people, representing our population in truth and fact, may commence those actions necessary to amend or alter the central document of this State's laws. For an unlawfully-formed legislature, crafted from unconstitutional gerrymandering, to attempt to do so is an affront to the principles of democracy which elevate our State and our nation. As such, defendant-appellants' contention that the action of the trial court is an "extreme overreach" ignores the reality of the court's order, and substitutes fear-mongering rhetoric for reasoned argument.[19]

---

[19] I find particularly disturbing the contradiction of defendant-appellants' position. To wit: One of the amendments proposed by the General Assembly was a Voter ID law, designed to prevent

Nor is the reliance of defendant-appellants upon federal case law convincing. While such law may form a persuasive argument, it is not binding upon the courts of this State. It is true that the trial court considered federal law in its order. However, that does not require this Court, or any other court of this State, to hold those cases as sacrosanct; they are persuasive authority, nothing more.

Nor does *Covington II* stand for the principle, as defendant-appellants contend, that by not ordering a special election, the *Covington II* court approved of the legislature. *See Covington v. North Carolina*, 267 F. Supp. 3d 664 (2017) (*Covington II*). A special election, as found in *Covington II*, is a special intrusion into the ordinary proceedings of the legislature and the state. The fact that *Covington II* did not see a need to preclude the General Assembly from taking *any* legislative action by ordering an immediate special election does not mean that the General Assembly's demonstrably unlawful existence was thereafter approved. To the contrary, the court in *Covington II* criticized the General Assembly's failure to act in the wake of prior decisions. I find it doubtful that the *Covington II* court, having once more reminded the General Assembly of its tenuous position, anticipated that the General Assembly would take its words as *encouragement* to enact constitutional reform in its present state. The decision not to order a special election was one intended to prevent disruption to ordinary legislative activity; it does not follow that extraordinary

---

citizens from unlawfully voting in our elections. And yet, this amendment was proposed by a General Assembly which was, itself, unlawfully formed.

legislative activity, such as constitutional amendments, would likewise be protected from scrutiny.

Finally, it bears recognizing that the act of placing these amendments on the ballot does not cure them of their unlawful origins. In his oft-quoted Gettysburg Address, President Abraham Lincoln emphasized "that government of the people, by the people, for the people, shall not perish from the earth." That it is the people, and not those they elect, who wield ultimate democratic power in this country is a principle which stems all the way back to the United States Constitution itself, the first words of which are "We the People[.]" Not We the Legislators, or We the Elected Officials. It is the people of our country, and of this State, who can and must determine how government power is wielded. That is precisely why it is necessary for the voters to approve any amendment to the North Carolina Constitution proposed by the General Assembly. N.C. Const. Art. XIII, § 4.

However, the people of this State cannot, by popular vote, approve an unlawful act of the General Assembly. The very provision of our Constitution which mandates review by the voting populace requires, before such a vote can take place, action by "three-fifths of all the members of each house" of the General Assembly. In other words, the popular vote as to whether to approve an amendment to the Constitution is predicated upon a preceding lawful action by the General Assembly. By necessity, once the legislature became aware that it was unconstitutionally formed, any actions taken to alter our State Constitution were void *ab initio*; the public vote could not

cure that deficiency any more than it could cure any other unlawful action by the General Assembly.

The North Carolina Constitution, as the foundational document of law in this State, is more than a mere piece of legislation. It is "the rudder to keep the ship of state from off the rocks and reefs." *Hinton v. Lacy*, 193 N.C. 496, 509, 137 S.E. 669, 676 (1927). It is the fulcrum which permits the lever of our State's justice to move mountains. Altering that document is an act by the General Assembly that strikes deep into the heart of our democracy – it can change the role of government, it can alter how laws are made, it can disrupt the flow of justice, it can even change what any of those words mean in the eyes of the law. Such action is to be taken with great care and caution. Once it was determined that our General Assembly was acting in violation of the Constitution, without the proper support of the electorate, it lost the authority to alter that document. To hold otherwise would be to permit total usurpation of our democracy and our system of laws by the very body that has been admonished by our nation's highest court for having previously done so.

To be clear, I do not believe that this Court should have found the General Assembly unable to pass any laws whatsoever. Our precedent on that point is clear: The General Assembly must be permitted to engage in the ordinary business of drafting and passing legislation, regardless of any issues of gerrymandering, as to require otherwise would create "chaos and confusion." However, the amendment of our Constitution is not an ordinary matter – it is a most extraordinary matter, and

one which goes beyond the day-to-day affairs of the General Assembly. That is why such amendments are put to the public on a ballot. And I believe that our laws provide that a Constitutional amendment may only be put to the public when it is drafted by a legislature formed in conformity with the Constitution itself. This is the extent of my position – only that the General Assembly, found to be unconstitutionally formed based on unlawful gerrymandering, could not attempt to amend our Constitution without first comporting itself to the requirements thereof.

Defendant-appellants, and the majority, embrace the notion that the choice is a binary one: Either the General Assembly can perform all actions that it normally could, or none. They maintain that, because the latter is not a choice at all, the General Assembly must logically be able to undertake any action it could have had it been lawfully composed. I believe, however, that the choice is not binary – it is a spectrum, illuminated with shades of grey between "everything" and "nothing" – and that a narrow ruling that the General Assembly, being unconstitutionally formed, cannot amend the Constitution, is a reasonable interpretation of our laws.

I therefore respectfully dissent from my colleagues, and would affirm the decision of the trial court.